IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RODICA WAIVIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04 C 3545 |
| | ) | 04 C 2314 |
| BOARD OF TRUSTEES, UNIVERSITY | ) | 04 C 6263 |
| of ILLINOIS at CHICAGO, PETER | ) | 05 C 2316 |
| NELSON, SOL SHATZ, AMY LEVANT, | ) | |
| CLARK HULSE, SYLVIA MANNING, | ) | HONORABLE CHARLES R. NORGLE |
| EDUCATIONAL TESTING SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

CHARLES R. NORGLE, District Judge

Before the court are Defendants' Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and 8(b). For the following reasons, Defendants' Motions to Dismiss are granted and the case is terminated with prejudice.

**I. BACKGROUND**[1]

**A. Facts**

The widely accepted proposition that the courts must "treat pro se litigants gently," see Lockhart v. Sullivan, 925 F.2d 214, 216 (7th Cir. 1991), must have been created for the case of Rodica Waivio ("Waivio"), a Romanian born student living in the United States. The voluminous record in this action stems from Waivio's failure pass a competency exam, and her eventual removal from

---

[1] The court takes the facts from Plaintiffs' Complaint, and the parties briefs in the Motion to Dismiss.

1

Defendant University of Illinois at Chicago's ("UIC") Graduate School. The long history of Waivio's claim began in 2001, when she was admitted to UIC's Ph.D. program in computer science. In 2001 and through 2002, Waivio worked as a graduate research assistant. Her advisor at the time was Clement Yu ("Yu"). Then, starting in January 2002, Baskar Dasgupta ("Dasgupta") served as Waivio's advisor through September 25, 2002. On that day, Dr. Dasgupta informed Waivio that he would no longer serve as her advisor, and that her research assistant position would not be renewed. Defendants allege that Dr. Dasgupta told Waivio that he could not understand her work, and he concluded that Waivio's work was "weird" and not up to the University's accepted standard for graduate level work.

Waivio alleges that Dr. Dasgupta denied her future employment because of her national origin, and also that "defendant's agents did not like mathematics which is a Romanian tradition." Waivio further claims to suffer from bipolar depression, and that she notified the Defendants of this condition in December 2001. However, Waivio did not register for disability services with UIC until May 28, 2003, one and a half years after she claims she first notified Defendants of her problem. As a result of Waivio's registration for disability services, UIC requested that Defendant Educational Testing Services ("ETS") provide Waivio with certain accommodations to take the Graduate Record Examination ("GRE"). ETS is not controlled by the University, and therefore UIC would not have the final say as to any accommodations that ETS provided to Waivio.

On May 30, 2003, Waivio filed her first grievance with UIC relating to her failure of the GRE. Defendant Peter Nelson ("Nelson") denied Waivio's grievance on June 10, 2003. In his denial, Nelson explained that Waivio elected to take the GRE as a substitute for the competency exam that is required for all students. Nelson also noted that Waivio had the lowest score of all the students who took the test. Waivio claims that she was denied the benefits of being a graduate student because nobody was

willing to serve as her advisor, after Dr. Dasgupta resigned his position. Waivio does not allege any efforts taken on her behalf to secure another advisor, after Dr. Dasgupta withdrew. Moreover, Waivio claims that UIC raised the passing level required on the GRE in 2004, in an effort to cause her to fail the exam, and eventually be removed from the program.

Waivio failed the GRE twice. The first time was in 2003, as mentioned in Nelson's denial of Waivio's first grievance. On her first exam, Waivio scored in the 27th percentile; the minimum passing grade was in the 67th percentile. In 2004, Waivio failed the GRE for the second time. She scored in the 58th percentile, the minimum passing grade was in the 70th percentile. Defendants claim that the minimum passing score changes each year based on the individual scores of each student sitting for the test. Put another way, the exam is graded on a curve.

Lastly, Waivio alleges that she encountered problems in a class taught by Thomas Moher ("Moher"). Specifically, Waivio alleges that she was treated differently than her classmates because she received a failing grade, while another student received an A. Furthermore, Waivio claims that from 2002 through 2004, UIC refused to give her financial support and employment with the university. Finally, in May 2003, Waivio received a warning of academic deficiency, based on her low grade point average, and on March 10, 2004, Waivio was terminated for failure to pass the Ph.D. competency exam on her second try.

**B. Procedural History**

On May 21, 2004, Waivio filed her initial complaint in the Northern District of Illinois. In addition to the case filed under the current docket number, Waivio has flied four other complaints, all in the Northern District of Illinois.[2] She has also filed two separate cases in the Illinois State Court. The court had given Waivio leave to amend her complaint eight different times, and finally held that

---

[2] See Case Nos. 04-C-6263, 04-C-2314, 05-C-2316, 06-C-1938

the "Corrected Second Short Amended Complaint" filed on August 10, 2005, was the final and operative complaint in this case. On September 16, 2005, UIC filed its Motion to Dismiss, and on September 23, 2005, ETS filed its Motion to Dismiss. On June 28, 2006, Waivio filed her Responses to UIC's and ETS's Motions to Dismiss, and on January 16, 2006, UIC filed its Reply. Then, on August 4, 2006, ETS filed its Reply. The Motions to Dismiss are fully briefed and before the court.

## II. DISCUSSION

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 8, "[A] pleading which sets forth a claim for relief, whether an original claim . . . shall contain . . . a short and plaint statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Furthermore, federal courts have "the inherent power to sanction for conduct which abuses the judicial process." Barnhill v. United States, 11 F.3d 1360, 1367 (7th Cir. 1993) (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991)). Such power is "governed not by rule or statute, but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Id. (quoting Link v. Wabash R. Co., 370 U.S. 626, 630-31 (1962)). The court's use of its inherent power "should be employed sparingly and only when there is a record of delay, contumacious conduct, or when other, less drastic sanctions prove unavailing." Dotson v. Bravo, 321 F.3d 663, 667 (7th Cir. 2003). When deciding the type of sanction to employ, "the court should consider 'the egregiousness of the conduct in question *in relation to all aspects of the judicial process*." Id. (emphasis included). The court has a wide discretion to dismiss a case with prejudice as a sanction. See id.

### B. Waivio's Complaint Abuses the Legal Process

#### *1. Waivio has used the court system to harass Defendants*

"There are species of misconduct that place too high a burden . . . for a court to allow a case to

4

continue." Dotson, 321 F.3d at 663 (quoting Barnhill, 11 F.3d at 1368). This is such a case. Waivio's Complaint stems from her dismissal from UIC's Ph.D. program for her academic deficiency, including her failure to pass a competency exam. When Waivio was dismissed from the program, she turned her anger and frustration not only on UIC and its Board of Directors, but on ETS, the company that administers the GRE, as well as Defense counsel. She has filed seven total complaints in this case, each time accompanied by a blunderbuss of exhibits. Each of these complaints are in excess of the fifteen page limit, single spaced, and contain hundreds of paragraphs, all in less than the standard twelve-point font. After each Complaint, Waivio filed a motion to amend parts of the complaint, either a paragraph in one count, or a sentence on a page, buried deep within her pleading.

Waivio has filed five separate cases in the Northern District of Illinois within the past two years. Most recently, she has filed a Complaint which was assigned to Judge Castillo, while this Motion to Dismiss was currently pending.[3] All of Waivio's complaints have been in excess of the fifteen page limit mandated in the local rules. See Local Rule 7.1. The court, understanding th pro se litigants must be treated gently, granted Waivio's request to file a brief in excess of the fifteen page limit. See Minute Order of September 7, 2005. Additionally, on January 12, 2006, when Waivio filed her two hundred and fifty-eight page Response to UIC's Motion to Dismiss, the court granted Waivio leave to file a shortened Response, in order to comply with the local rules. See Minute Order of January 12, 2006. Even after the court had granted Waivio leave to file a brief of 50 pages, she still moved the court to grant her leave to supplement her pleadings to include even more pages and exhibits. See Minute Order of February 16, 2006.

Waivio's actions became so egregious, that UIC eventually sought an order of protection and sanctions against her. Specifically, it its Motion for Sanction and for a Protective Order, UIC states

---

[3]Case No. 06-C-1938

5

that during a conversation with Waivio, she said that "if I lose this case, I will kill you." See Minute Order of March 2, 2006. Additionally, counsel informed the court that Waivio had attempted to physically restrain him, and yelled obscenities in the hallway at the courthouse after court calls. Defendants further allege that Waivio has also made unsolicited visits to defense counsel's office in an effort to discuss the case. See id.

In September 2005, Waivio filed a Motion to Strike. After Defendants' filed their Response, Waivio wrote defense counsel three emails within the span of four hours. Waivio's initial e-mail stated that defense counsel was "crazy" and should seek help for a mental disorder. See id. Within two hours, Waivio sent a second e-mail, apologizing for her behavior. The third e-mail strangely asks if defense counsel wants plaintiff to "lie in bed." See id.

Furthermore, defense counsel cites several instances where Waivio abused court procedure. In June and July 2005 Waivio issued a litany of discovery requests, and failed to give notice to defense counsel of any of these requests. Additionally, Defendants inform the court that Waivio has filed two state court cases in the Circuit Court of Cook County, alleging the same cause of action as her federal claim. In the course of the state court action, Waivio has verbally harassed counsel outside of the courtroom.

Waivio admitted to several of the instances alleged in Defendants' Motion for Protective Order. In regards to her purported verbal harassment, Waivio states that "maybe the words 'liar' or 'crook' were used . . . ." and that she used "the Romanian word 'frac,' and also the word 'escroc,'" Pl.'s Resp. to Mot., ¶ 12. Waivio further explains that her "reckless behavior" was motived "by the plaintiff's disability which means plaintiff is a person with emotional disability and the present situation is very stressful, therefore most probable plaintiff was a little careless to the words or expressions used. . . ." Id., at 8. Waivio further acknowledges that she is "a subject of

misinterpretations and misunderstandings." Id. Moreover, implicit in Waivio's denial of her threat to kill defense counsel, is her acknowledgment that she has used harsh words with Defendants attorneys.

Undaunted by the Protective Order, or the court's many warnings, Waivio has continued to file countless pleadings styled either "Motions" or "Requests" under various Federal Rules of Civil Procedure. A majority of these pleadings are drafted in such a manner as to make it extremely difficult to decipher exactly what relief Waivio requests. For example, on January 11, 2006, Waivio filed a pleading styled "Motion Pursuant to Rule 8 or Rule 42; Denying UIC's Motion to Dismiss; Motion Supporting Order from 11/03/04." See Doc. No. 244. In her Motion, Waivio alleges the following:

> On April 25, 2005, UIC Defendants filed two motions of reassignment and consolidations of case 05-C-2314 and case 05-C-2316 to the case 04-C-3545. These motions from Documents [54] and [56], on the case record, are UIC's defense in support of consolidation. However, the main UIC's statement which is at the core of these motions is "[case 04-C-3545 is] action involving a [federal] question of law or fact and [is] pending before the court," which means the UIC's hypothesis is: "[case 04-C-3545 is] properly before this court since raise federal questions" as seen in Document [212]. Plaintiff names this UIC's defense as STATEMENT A IN DEFENSE for UIC.
> On September 16, 2005, UIC defendants filed a motion of dismissal in case 04-C-3545. The motion and memorandum, from Documents 191, and 193-2, are UIC's defense in support of dismissal. However, the main statement made by UIC defendants which is at the core of this motion is "[Plaintiff failed case 04-C-3545, and the case should be dismissed under Rule 8 and Rule 12 FRCP]"; UIC defendants claimed case 04-C-3545 was not a proper federal question conforming to federal laws and regulations. Plaintiff names this UIC's defense as STATEMENT B IN DEFENSE for UIC.
> This above STATEMENT A and STATEMENT B are related, because they are based on the status of the case 04-C-3545, but they are in alternative, which means when STATEMENT A is sufficient, STATEMENT B is insufficient; and when STATEMENT B is sufficient, STATEMENT A is insufficient."

Def.'s Mot. Pursuant to Rule 8 or Rule 42, ¶¶ 5-7.

This motion is more akin to a mathematical formula than a legal brief. It is difficult to understand the purpose for the motion, or what is the request for relief. The court construed this pleading as a Response to the pending Motion to Dismiss. However, Waivio filed this motion two months after she filed her initial two hundred and fifty-eight page Response to UIC's Motion to Dismiss. On January 12, 2006, the court struck Waivio's Response, and granted her leave to file an amended response that conformed to the local rule. The logic of filing two separate Responses to a Motion to Dismiss, two months apart, where one brief is in excess of two hundred and fifty pages, and the latter only four pages in length, strains common sense.

Lastly, in perhaps the most egregious action of her continued misconduct, Waivio filed a rambling, fourteen page pleading styled "Short Amendment to [379]."[4] Upon review of the docket, document number 379 is a "Motion pursuant to Rule 8(e)(2), 60(b), and 8(b), as well as 28 U.S.C. § 2072 or U.S. Constitution." In her "Short Amendment" Waivio alleges the following.

> Plaintiff brings [379] and present document also pursuant to Rule 60(b)(5) because order [309] or [369] "it is no longer equitable that the order should have prospective applicability." In [309] this court made a series of citation of matters from defendants' motion [151] and [292] however this court inappropriately incriminated plaintiff by inappropriate interpretations. In [309] Court failed to point out that court did not look at the credibility of defendants' statements listed in [309]. Court's list of facts from [309] are disrespectful, indecent and raises a few questions while they create ground for sex harassment against plaintiff. Furthermore plaintiff would like to report plaintiff believes that [309] is a matter of sex harassment against plaintiff which resulted in plaintiff being subjected to sex harassment. Shortly court's order [309] resulted in sex harassment against plaintiff. Shortly it is ashamed for a District court to publish statements as those shown in [309], while evidently they are just misinterpretations of a Pro Se litigant . . . .
> Norman Jeddeloh and Richard Hellerman are dishonest persons designated to make actions and statements, and try desperately almost anything. The statements from [292] and [151] are dishonest and disrespectful matters and they

---

[4]This is Waivio's standard operating procedure. She files a motion under a Federal Rule, and then a few days later, files a pleading styled "Amendment" to her previously filed motion.

> lack respect and good decency and this court is not allowed to inappropriately make favor. In [334] plaintiff showed that they killed the plaintiff's baby, and they proved that they can do anything unless appropriately controlled by this court; plaintiff proved in [334] that defendants' statements were false.

Def.'s Mot., at 5. Waivio cites to no evidence in the record to justify the allegations that defense counsel are responsible for the death of her baby. Such allegations are beyond the scope of any claim in any of Waivio's complaints, and are not grounded in any good faith basis. If any party must be controlled by the court, it surely must be Waivio.

Then, on August 18, 2006, while this Motion to Dismiss was under advisement, Waivio filed yet another rambling, fourty-four page pleading styled "Plaintiff's Reply to Defendants' Response to Plaintiff's Motion [379, 395]." In it, Waivio makes the following claims.

> In [379] plaintiff alleged that defendants continued their inappropriate conduct and that they was [sic] endangering the plaintiff baby life. Plaintiff under oath affirmed that Norman Jeddeloh [C]ontinued his practice of inappropriate behavior against plaintiff by scramming, terrifying plaintiff by inappropriate gesture and sever hostility on March 16, 2006 [two weeks from the order [309]] in State Court; furthermore Grosch continued to solicits plaintiff "at the message center from [her] building" which was interpreted by plaintiff as "sex solicitation" or "solicitation to harm plaintiff." Plaintiff alleged that the present conditions, as plaintiff alleges defendants unlawfully discriminate against plaintiff are inappropriate for a child and endanger the baby's life. . . .
> In [400] Julie Grosch affirms that Jeddeloh and Grosch were "on a date" on March 16, 2006; she affirms love involvement with Norman Jeddeloh, and affirms Jeddeloh might ave been jealous as vehement discussions and loud voiced were proving Jeddeloh' love involvement with Julie Grosch; Plaintiff believes the vehement discussion was related with a "special relationship" between Hellerman and Grosch [see 269]; on March 16, 2006 as well as in other opportunities Jeddeloh exhibit a high interest in special endowed women, in particular Julie Grosch; from beginning of May 2005, Grosch witnessed an authentic interest of Norman Jeddeloh for sex; Jeddeloh's interest for sex exploded on March 16, 2006 through a vehement jealousy behavior, proving incontestability that sex was a high interest of Jeddeloh, while wearing extravagant closes [sic] confirming his sex interest; Grosch entertained UIC agents' sex interest . . . by placing herself very closely to UIC agents, through solicitations, reciprocal visits . . . phone calls . . . and some time wearing extravagant closes [sic] as well as she let herself being called "she is my girlfriend" or matters very much related to this.

Pl.'s Mot, at 16. Doc. No. 405.

Once again, this motion has no relation to Waivio's federal claims, and serves merely to burden the court with frivolous arguments and baseless accusations. The personal lives of the attorneys in this case is of no concern to the court, let alone to Waivio. Furthermore, Waivio includes a plethora of exhibits, all of which bear absolutely no relationship to this case. She includes a report titled "Endocrine Function- Tumor Markers," Ex. 1; as well as various pleadings from her ongoing state action. See Ex.2. Motions such as these support the court's conclusion that the only acceptable sanction at this point in the litigation is to dismiss the case with prejudice.

### 2. *Dismissal with Prejudice is the only feasible sanction for this cause of action*

Waivio has continued to ignore court orders relating to page limits and the filing of extraneous motions. Instead, she has inundated this court with a deluge of pleadings, ranging from requests to stay discovery, to motions for protective orders based on pleadings filed by UIC and ETS's attorneys. This case, filed in 2004, has over 400 docket entries. Comparable cases, dealing with similar claims such as Title VII and the ADA, filed around the same time as Waivio's, typically have between 50-75 entries in the docket. A majority of these pleadings lack any type of good faith basis for presentment. Yet, time and again, the court granted Waivio several extensions, and warned her about page limitations, and the possibility of sanctions. In fact, the court allowed Waivio ten months to file a Response to the Motions to Dismiss.

The court also notes that in that ten month time span, Waivio filed countless motions with the court that had little if anything to do with the pending Motion to Dismiss. In each of her pleadings, Waivio references other motions she has filed by docket number alone. In virtually all of her pleadings, she includes a string of four, five, or six docket numbers in a row, and uses these numbers as if the court could tell from the face of her motion what she references. The court reminds Waivio that her pleadings must make all arguments accessible to the court, least

she forces us to "play archaeologists with the record." Chicago Bd. of Educ. v. Substance, Inc., 354 F.3d 624, 630 (7th Cir. 2003). Moreover, the court reiterates that "judges are not like pigs, hunting for truffles buried within the record." Roger Whitmore Auto Services, Inc. v. Lake County, Il., 424 F.3d 659, 664 n. 2 (7th Cir. 2005) (quoting United States v. Dunkel, 927 F.2d 955, 965 (7th Cir. 1991)).

By filing several complaints in both the federal and state courts, Waivio runs the risk of creating piecemeal litigation. "Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results." Tyrer v. City of South Beloit, - - F.3d - -, 2006 WL 2136641, *10 (7th Cir. Aug. 2, 2006) (quoting LaDuke v. Burlington N. R. Co., 879 F.2d 1556, 1560 (7th Cir. 1989)). If Waivio pursues both her state court action along with her federal claims, "substantially similar issues will be litigated simultaneously in different forums." Id. Waivio has proven a less than candid party with the court, filing several other complaints in the Northern District, without informing this court of her actions, while this case is currently pending. As a result, "the possibility exists that one court, unaware that the other court has already ruled, will resolve an issue differently and create a conflict between the two forums." Id.

Furthermore, there is no evidence that any other type of sanction, except for dismissal with prejudice would be effective. Based on Waivio's propensity for protracted litigation, any imposition of monetary sanctions would be met with further briefing, and ensuing motions to add "Amendments" to those briefs. Moreover, there is no assurance that a monetary sanction would deter Waivio from filing countless other frivolous motions with the court. Her behavior over the past two years has demonstrated that nothing short of the abrupt dismissal of this case will cease the constant onslaught of motions she creates. "[O]ther, less drastic sanctions [would] prove unavailing." Dotson, 321 F.3d at 667. The court has given Waivio considerable leeway and a

11

significant amount of time to prosecute her case. After two years, Waivio's case is the "species of misconduct that place too high a burden . . . for a court to allow a case to continue." Dotson, 321 F.3d at 663 (quoting Barnhill, 11 F.3d at 1368). The court recognizes that "dismissal is a harsh sanction, but 'the most severe in the spectrum of sanctions proved by statute or rule must be available . . . not merely to penalize those whose conduct may be deemed to warrant a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterent.'" Dotson, 321 F.3d at 667 (quoting Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 642 (1976)). Therefore, the court will exercise its discretion and dismiss Waivio's Complaint, with prejudice.

### III. CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss is granted. Plaintiff's Complaint is Dismissed, with prejudice.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATED: 8/31/06